UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHAD PETITPAS,
    *Plaintiff*,

    v.

ROBERT MARTIN *et al.*,
    *Defendants*.

No. 3:17-cv-01912 (JAM)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Chad Petitpas is a prisoner of the Connecticut Department of Correction ("DOC"). He has filed this lawsuit alleging that DOC officials have violated the U.S. Constitution's Equal Protection Clause by subjecting him to a higher risk classification on the ground of his conviction for a sex offense. Defendants have moved for summary judgment on his claim, and Petitpas has filed a cross-motion for summary judgment. I will grant defendants' motion for summary judgment and deny Petitpas's cross-motion for summary judgment.

**BACKGROUND**

The facts here are taken from the parties' Local Rule 56 Statements and supporting submissions. By way of background, the policy that Petitpas is challenging derives from the DOC Classification Manual, Doc. #98-4 at 8-72, and Administrative Directive 9.2, entitled "Offender Classification," *id.* at 74-87.[1] Whenever prisoners are admitted or readmitted into DOC custody, they receive an "initial classification" assessing their "risks," "needs," and "overall risk." Doc. #110-1 at 2 (¶¶ 3-4); *see also* CM at 3-6.

---

[1] I will cite to the Classification Manual ("CM") using its internal pagination and to any Administrative Directives ("AD") by their specific sections. I will otherwise cite to the CM/ECF-assigned page numbers.

1

The following risk factors are assessed and assigned "levels" from 1 to 5, with 5 being the highest risk: escape profile; severity/violence of the current offense; history of violence; length of sentence; presence of pending charges and/or detainers; discipline history; and Security Risk Group membership. Doc. #110-1 at 3 (¶ 10); *see also* CM at 8-24. The following needs are assessed and assigned "scores" from 1 to 5, with 5 being the highest need: medical; mental health; education; substance abuse treatment; vocational/work skill; sex treatment; and family/residence/community resource. Doc. #110-1 at 3 (¶ 11); *see also* CM at 26-40.

A sex treatment need ("STN") score is determined using police reports, victim statements, DOC records, and other documents. Doc. #110-1 at 4 (¶ 12); *see also* CM at 35. The score denotes that a prisoner has a history of problem sexual behavior and encapsulates the prisoner's "sexual re-offense risk" and "program intervention needs." Doc. #106-1 at 4 (¶¶ 8-9); *see also* CM at 35. The score does not necessarily indicate that a prisoner has been convicted of a violent offense, an offense with a high seriousness level, or an offense for which the prisoner would be required to register as a sex offender. Doc. #110-1 at 4-5 (¶¶ 13-16).

After the initial assessment of a prisoner's risks and needs, an overall risk level is set at the highest level that has been assigned to any one of the prisoner's seven risk factors. Most critically for purposes of this action, however, a prisoner who is serving a sentence for a sex offense, who has a history of sex offenses, or who has an STN score of 2 or greater cannot receive an overall risk level reduction from 3 to 2 without the approval of the DOC Commissioner or the Commissioner's designee, the Director of Offender Classification and Population Management ("OCPM"). *See* CM at 7, 51; *see also* AD 9.2 §§ 8(C), 10(B)(2). In addition, only a "favorable recommendation" from the unit administrator (*i.e.*, the warden) will

2

be forwarded to the OCPM Director for consideration whether to approve an overall risk level reduction. *See* CM at 51.[2]

Prisoner classifications, including their overall risk level, are subject to "reclassification" review on a biannual or annual basis and at certain other junctures. Doc. #110-1 at 6-7 (¶¶ 22-30); *see also* CM at 48-65. The record reflects that from 2013 to 2018 no DOC warden has granted a sex offender a "favorable recommendation" for a reduction in risk level. Doc. #106-1 at 5-6 (¶ 11).

A reduction in risk level may benefit a prisoner in at least two ways. First, a prisoner's overall risk level generally dictates which security-level prison the prisoner will be housed in. Doc. #110-1 at 2 (¶ 4). In other words, the lower the risk level, the more likely the prisoner is to be housed in a prison with fewer security restrictions on inmates.

Second, a lower risk level may allow a prisoner to earn more Risk Reduction Earned Credits ("RRECs"). *Ibid.* (¶ 5). Prisoners can earn RRECs only at the discretion of the DOC Commissioner, if they have not committed certain excluded offenses, if their overall risk level is below 5, if they are compliant with their Offender Accountability Plan, and if they exhibit good conduct and compliance with DOC rules, among other things. *See* AD 4.2A, 4.2A attach. A; *see also* Conn. Gen. Stat. § 18-98e. Prisoners at lower security levels may earn RRECs at a greater rate than prisoners at higher security levels. The RREC rates are as follows: 3 days per month for overall risk level 4; 4 days per month for levels 3 and 2; and 5 days per month for level 1. Doc. #110-1 at 3 (¶¶ 6-8); *see also* AD 4.2A, 4.2A attach. A.

---

[2] Defendants argue that technically the DOC Commissioner and OCPM Director have authority to grant a reduction in overall risk level for someone in Petitpas's position without a "favorable recommendation" from the warden. Doc. #106-1 at 5 (¶ 10); Doc. #118 at 2 n.1. But the submissions that defendants cite to support this assertion do not show that there is any means for a prisoner like Petitpas to bypass the warden and submit a request for an overall risk level reduction directly to the DOC Commissioner or OCPM Director for review, that the DOC Commissioner or OCPM Director would consider such a request, or that they have ever considered such a request. Therefore, as a practical matter, it is undisputed that the warden is the gatekeeper for such reductions in overall risk level.

Petitpas is confined at Brooklyn Correctional Institution ("Brooklyn CI"), where he is serving a 19-year state prison sentence following his conviction on multiple counts of first-degree sexual assault and related charges. He was convicted on the basis of evidence showing that, when he was 28 years old in October 2006, he forced a 15-year-old girl to engage in oral and vaginal intercourse. Doc. #110-1 at 1 (¶ 1); *see also State v. Petitpas*, 299 Conn. 99, 105 (2010); *State v. Petitpas*, 183 Conn. App. 442, 444 (2018).

Petitpas has an STN score of 3 and an overall risk of level of 3. Doc. #98-4 at 5 (¶¶ 27-29); Doc. #110-1 at 3 (¶ 9). As detailed below, Petitpas seeks to lower his overall risk level so that he might qualify for the benefits of a less secure prison designation and for the opportunity to earn more RRECs, but he contends that he has been wrongfully precluded from having his risk level reduced as a result of discrimination against him on the basis of his status as a sex offender.

On November 8, 2017, Petitpas submitted an Inmate Request Form (CN 9601) requesting Brooklyn CI's warden to grant him a "favorable recommendation" so that "it can be reviewed by the [DOC] Commissioner for consideration" because that is "[t]he only way for [him] to go from an overall risk level of 3 to an overall risk level of 2." Doc. #110-2 at 4. On November 14, 2017, the warden denied Petitpas's request "due to the nature of [his] instant offense." *Ibid.*

On November 14, 2017, Petitpas filed this lawsuit *pro se*. Doc. #1. In his amended complaint, he alleges that he is "a model inmate navigating the policies and unjust standards set forth by the Department Of Correction for Sexual Offenders." Doc. #10 at 2. Petitpas alleges that although he has "followed religiously" his Offender Accountability Plan, the "favorable recommendation" policy in the DOC Classification Manual denies him and other sex offenders and prisoners with an STN score of 2 or greater "the ability to earn the shortest sentence possible." *Id.* at 5 (¶¶ 13-14). Specifically, he alleges that a warden's recommendation that is

4

needed for a sex offender to progress from overall risk level 3 to 2 is never given as a matter of course, thereby depriving such offenders of access to certain transitional programming and from ever being able to progress to overall risk level 1, where they can earn the maximum RREC rate. *Id.* at 5 (¶ 14), 8-9 (¶¶ 25-29).

The result, Petitpas laments, is that "the murderer, robber and assaultist [*sic*] are . . . more likely to achieve a lower security status," because even they are not required to obtain a "favorable recommendation." *Id.* at 8 (¶ 25). He alleges that the DOC policy discriminates against sex offenders and prisoners with an STN score of 2 or greater without a rational basis. *Id.* at 5 (¶ 12). Petitpas seeks injunctive and other equitable relief. *Id.* at 11-12.

In my initial review order, I permitted an equal protection claim to proceed principally on the basis of these allegations while dismissing Petitpas's other claims. Doc. #14; *see Petitpas v. Martin*, 2018 WL 5016997 (D. Conn. 2018). Petitpas subsequently clarified at oral argument and in supplemental briefing, Doc. #117, that he is challenging the "favorable recommendation" policy as it has been applied to him, as opposed to making a facial challenge to the policy. Therefore, I consider any facial challenge to the policy as having been abandoned and consider only his as-applied equal protection challenge.[3]

Defendants now move for summary judgment on grounds that Petitpas lacks standing, that he has not exhausted his administrative remedies, that he is not similarly situated to other

---

[3] Defendants argue that there is no basis for an as-applied equal protection claim in Petitpas's amended complaint. Doc. #118 at 1-2. I do not agree. Petitpas made a number of allegations in his *pro se* amended complaint, which I must liberally construe, that only make sense if understood as an as-applied equal protection claim. *See, e.g.*, Doc. #10 at 3 (¶ 5) (noting that he "had no disciplinary infractions in over a decade and was in full compliance with DOC's Offender Accountability Plan (OAP) when he was denied the . . . level reduction"). If that was not apparent enough to defendants, I noted in my initial review order that they may file a dispositive motion "that states any grounds that in fact support or would rationally support the policy and distinctions it draws *as applied to Petitpas in this case*." Doc. #14 at 11 (emphasis added). Finally, "[e]ven if a facial challenge was intended, a facial challenge in the context of the present equal protection claim would logically include within it an as-applied challenge . . . ." *Ramos v. Town of Vernon*, 353 F.3d 171, 174 n.1 (2d Cir. 2003).

5

prisoners convicted of violent offenses who are not subject to the "favorable recommendation" policy, and that there is a rational basis for the policy. Doc. #98.[4] Now represented by counsel, Petitpas has filed a cross-motion for summary judgment arguing that he is similarly situated to those other prisoners and that the discriminatory policy lacks a rational basis. Doc. #100.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close and contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

### *Standing*

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. For a federal court to have subject matter jurisdiction over a case, a plaintiff must show that he has "standing"—that is, an injury-in-fact that was caused by the defendant and for which a favorable decision by the court is likely to

---

[4] Defendants also argued that Petitpas's challenge to the DOC's community release policy is not ripe because he is not yet eligible for community release. Doc. #98-1 at 16-17; Doc. #106-2 at 23-25. In his response to defendants' motion, Petitpas agreed that any such challenge is not ripe and clarified that he is not challenging the community release policy. Doc. #110 at 2.

6

furnish relief. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). A plaintiff must show that he satisfied these requirements when he filed the lawsuit. *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020).

The burden of establishing standing increases over the course of the litigation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Ibid.* (internal citation omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). These submissions must at least demonstrate that there is a fact issue whether the plaintiff has standing. *See Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013), *as amended* (Mar. 21, 2013).

Defendants argue that Petitpas lacks standing because he has not suffered an injury-in-fact. Doc. #98-1 at 13-16. Petitpas responds that, because he cannot qualify for a risk level less than 3, he is missing out on "significant" reintegration programs and counseling that is "concentrated" at Willard-Cybulski Correctional Institution ("Willard CI"), the only level 2 facility in the State, as well as employment opportunities at Brooklyn CI and other level 3 and 4 prisons that are only available to level 2 prisoners and that afford greater freedom of movement, such as "cleaning, maintenance and landscaping work on the grounds, public and office areas." Doc. #110 at 4-5.

Defendants dispute that the reintegration programs Petitpas wishes to take advantage of are in any way unique to Willard CI, save for perhaps the E.N.O.U.G.H. program. Doc. #106-1 at 11-12 (¶ 28). Even if these programs were uniquely available at Willard CI, defendants argue that it is speculative whether an order eliminating the challenged policy would actually provide Petitpas access to them because eligibility for an overall risk level reduction does not guarantee a

7

reduction, only consideration for one. Doc. #106-2 at 21. Defendants note that only "about" one-third of level 2 inmates are housed at Willard CI, with the rest housed at higher-level prisons due to occupancy limits. Doc. #106-6 at 2-3 (¶¶ 5-6). Defendants further argue that, even if Petitpas were to gain a transfer to Willard CI, the E.N.O.U.G.H. unit's occupancy is limited, and Petitpas would have to make it through a competitive interview process in order to join. *Id.* at 4 (¶ 12).

Petitpas replies that his compliance with his Offender Accountability Plan and his level 1 discipline, escape, detainer, and gang membership risk scores make it sufficiently likely that an order eliminating the challenged policy or allowing STN scores to vary downward as well as upward based on prisoner rehabilitation and good conduct would provide "meaningful relief." Doc. #110 at 6; *see also* Doc. #98-7 at 24; Doc. #100-11 at 2 (¶¶ 6-7).

I conclude there is at least a genuine fact issue to suggest that Petitpas has sustained an injury in fact. As defendants have noted, "common sense dictates that in lower level facilities, . . . there is more freedom of movement and less stringent facilities," whereas "higher level facilities . . . are . . . subject to much more restrictive conditions." Doc. #118 at 3. Defendants conceded at oral argument that the denial of an opportunity to be confined at a lower-security prison would suffice to show an injury-in-fact. It is not certain that the OCPM Director would reclassify Petitpas to overall risk level 2 even with a "favorable recommendation" from the Brooklyn CI warden, or that Petitpas would then be transferred to Willard CI. But his factual submissions, which I must accept as true for purposes of the standing inquiry at this stage, have at least raised a fact issue whether that would occur.

Defendants further argue that Petitpas has failed to show that such injury is redressable because, even if he were granted a reduction in overall risk level from level 3 to 2, he only has about a one-third chance of being transferred to a level 2 facility in Willard. But "all that Article

8

III requires" to satisfy the redressability requirement is "that relief would redress [plaintiff's] injury—at least to some extent." *Citizens for Responsibility & Ethics in Washington v. Trump*, 953 F.3d 178, 194 (2d Cir. 2019), *as amended* (Mar. 20, 2020). As things now stand, Petitpas has no chance at all of being transferred to a level 2 facility. But with a favorable decision, his chance of achieving a transfer could exceed one-in-three, which is enough to raise a fact issue that his injury is redressable. *See, e.g.*, *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 601-02 (2d Cir. 2016) (finding injury is redressable where "[i]nvalidation of the challenged ordinance . . . would tangibly improve the chances of construction," and noting "[r]edressability is not a demand for mathematical certainty") (internal quotations and citations omitted). Accordingly, Petitpas has raised a fact issue whether he has standing to pursue his claim.

### *Exhaustion*

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is mandatory. *See Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). It applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative procedures must occur regardless of whether the procedures can provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).

Because failure to exhaust is an affirmative defense under the PLRA, defendants bear the burden to show that administrative procedures exist and apply to the underlying dispute. *See Romano v. Ulrich*, 773 F. App'x 654, 656 (2d Cir. 2019) (citing *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015)). If defendants meet this initial burden, then Petitpas may respond by showing that administrative procedures were practically unavailable. *Ibid*.

The DOC's process for appealing a "classification decision," including "risk level decisions," is set forth in Administrative Directive 9.6 § 7. Such an appeal must be made using an Inmate Administrative Remedy Form (CN 9602) within 15 calendar days of the adverse decision. AD 9.6 § 7. A unit administrator must respond within 15 business days of the appeal with a decision, which "shall not be subject to further appeal." *Ibid*.

Defendants do not dispute that Petitpas exhausted the exhaustion procedure specified for appealing a classification decision under AD 9.6 § 7. They argue instead that, because Petitpas is challenging DOC *policy*, he was required to exhaust a different four-step grievance process for "any issue relating to policy and procedure" under Administrative Direct 9.6 § 6. Doc. #98-1 at 25-27. Petitpas responds that he pursued the proper procedures and because a warden's classification decision is not subject to further appeal under Administrative Directive 9.6 § 7, he had no further remedies after the warden denied his request. Doc. #110 at 2-4.

I do not agree with defendants' argument that Petitpas failed to exhaust the proper administrative remedial procedures. As Petitpas clarified at oral argument, he does not challenge the "favorable recommendation" policy *per se* but is seeking to be reclassified from overall risk level 3 to 2. Although in practice the "favorable recommendation" policy has functioned as a bar to Petitpas's reclassification, it does not formally prohibit his reclassification; the warden's decision whether to issue a "favorable recommendation" and the OCPM Director's decision

10

whether to reclassify a prisoner are discretionary. Therefore, there was no need for Petitpas to pursue administrative procedures to challenge the policy itself, but only the decision not to grant him a "favorable recommendation." That decision is effectively a classification decision because, without a "favorable recommendation," Petitpas cannot achieve a reduction in his overall risk level classification.

Classification decisions are properly appealed under Administrative Directive 9.6 § 7, and Petitpas properly exhausted these procedures. On November 8, 2017, he requested the warden to grant him a "favorable recommendation" while noting that it was the only means for him to obtain a review by the DOC Commissioner and ultimately reclassification from overall risk level 3 to 2. On November 14, 2017, the warden denied Petitpas's request. Although Petitpas technically used the wrong form to make his request (CN 9601 instead of CN 9602), the warden denied the request on substantive grounds (the nature of his offense) as opposed to procedural grounds (use of the wrong form), and the denial was not subject to further appeal. Petitpas filed his complaint in federal court that same day. Accordingly, defendants have not met their burden of showing that Petitpas failed to exhaust his claim.

### *Equal protection*

"The Equal Protection Clause . . . commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). A plaintiff may state a violation of the Equal Protection Clause when the government singles him out as a "class of one" for disparate treatment. *See, e.g.*, *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018). To succeed on a class-of-one claim, a plaintiff must show that he "has been intentionally treated

differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe*, 509 U.S. 312, 319 (1993) (internal citations omitted). Nor is legislative choice a subject for "courtroom fact-finding," but rather "may be based on rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). A governmental classification will be upheld if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313. In order to rebut the "strong presumption" that a classification is valid, *id.* at 314-15, the party challenging the classification bears the burden to "negative every conceivable basis which might support it," *Heller*, 509 U.S. at 320. *See generally Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (applying these principles of rational basis review to a class-of-one claim).

At the summary judgment stage, the burden is on Petitpas to produce evidence to "discredit any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record or actually motivated the [decision maker]." *Beatie v. City of New York*, 123 F.3d 707, 713 (2d Cir. 1997) (internal quotations and citations omitted). Even just "*some* evidence" to support a rational basis for a classification will be sufficient to uphold the classification at summary judgment. *See Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 285 (2d Cir. 2015). The classification must be upheld unless it can be said that no reasonable jury could conclude that there are reasonably conceivable rational grounds for the disparate treatment. *See Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 137 (2d Cir. 2013).

Defendants proffer several reasons why it is rational to prevent sex offenders like Petitpas from progressing below risk level 3 while allowing those convicted of violent crimes of a non-sexual nature to qualify for a lower risk level. First, they argue that level 2 prisons do not have staff or programs capable of providing sexual treatment to prisoners with STN scores of 2 or greater, which can help reduce recidivism. Doc. #98-1 at 23-24. This argument is not convincing, because it begs the very question why the DOC does not offer such programming at level 2 prisons. If defendants have decided *ex ante* to allocate their programming resources for the very same discriminatory reasons about which Petitpas complains, this discriminatory allocation of resources does not furnish a rational basis for them now to discriminate against Petitpas.

Defendants next argue that recidivism rates are higher for prisoners who have committed sex offenses or with a history of problem sexual behavior compared to other offenders. *Id.* at 24 (citing *McKune v. Lile*, 536 U.S. 24, 33 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault.") (citing U.S. Department of Justice study)). Petitpas disputes that sex offenders are more likely to reoffend than other offenders, citing a 2017 Connecticut Office of Policy and Management study. Doc. #110 at 11-12 (citing Doc. #100-12). But the fact that the parties can reasonably debate whose recidivism rates are higher—sex offenders or other offenders—demonstrates the existence of a rational basis for the classification at issue. As the Second Circuit has observed, "[p]risoners who have committed sex offenses can rationally be deemed more dangerous to society . . . ." *Green v. Armstrong*, 189 F.3d 460, at *2 (2d Cir. 1999) (summary order); *see also Vasquez v. Foxx*, 895 F.3d 515, 525 (7th Cir. 2018) ("[O]ur role is not to second-guess the legislative policy judgment by parsing the latest academic studies on sex-offender recidivism.").

It is certainly rationally conceivable (even if debatable) that confining sex offenders to less pleasant, higher security prisons where they are less likely to escape will serve to protect the public safety and deter future sex offenses. To the extent that Petitpas's data show that recidivism rates are comparatively lower for sex offenders, then that could be taken as evidence that confining sex offenders to higher security prisons has in fact deterred them from committing more crimes than they otherwise would have.

Defendants additionally argue that the challenged policy is for Petitpas's own good: sex offenders, especially child sex offenders like Petitpas, may be more vulnerable to assault by other prisoners, such that transferring them to a less secure level 2 prison could increase the risk of assault and therefore the risk of injury to prisoners and staff. Doc. #106-2 at 13-15 (citing cases and law journal articles); Doc. #118 at 3. Petitpas responds by pointing to a news report of a sex offender who was murdered by another prisoner while in a maximum-security prison in Massachusetts. Doc. #117 at 2. But this anecdotal account notwithstanding, it is at least rationally conceivable that sex offenders are more likely to be assaulted than other offenders, thereby justifying keeping them at higher security prisons so as to reduce the chances of violence.

All in all, Petitpas has not shown that there is no rationally conceivable reason for the DOC to treat him less favorably for security risk level purposes than violent offenders who have not been convicted of a sex offense like Petitpas. Accordingly, because there is a rational basis for defendants' disparate treatment of Petitpas, I will grant defendants' motion for summary judgment and deny Petitpas's cross-motion for summary judgment.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion for summary judgment (Doc. #98) and DENIES Petitpas's cross-motion for summary judgment (Doc. #100). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 11th day of September 2020.

                                          /s/ *Jeffrey Alker Meyer*
                                          Jeffrey Alker Meyer
                                          United States District Judge